## NATIONAL ELECTRIC SIGNALING CO. v. UNITED WIRELESS TELEGRAPH CO.

(Circuit Court, D. Maine. September 21, 1911.)

No. 643.

1. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — WIRELESS TELEGRAPH SYSTEM.

The Fessenden patent, No. 706,736, for a system of transmission of energy by electromagnetic waves, with a closed circuit tuned to the frequency of the transmitted impulses and a current-operated wave-responsive device, discloses patentable invention in view of the prior state of the art of wireless telegraphy, and is not anticipated by the device employing a coherer or circuit closer with a system of tuning, the object of which was to secure precision between the transmitter and a single receiver, and to enable the operator to adjust the transmitter to receivers at different stations, nor by certain publications; also, *held* infringed, as to claims 6, 9-12, 14, 19-21, 27-30, 32, 33, and 35.

2. PATENTS (§ 69*)—ANTICIPATION—PUBLICATION—SUFFICIENCY.

For a publication to constitute an anticipation of a patent, it must describe the invention in such full, clear, and intelligent terms as to enable persons skilled in the art to reproduce the process or article without assistance from the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 84; Dec. Dig. § 69.*]

In Equity. Suit by the National Electric Signaling Company against the United Wireless Telegraph Company. Decree for complainant for injunction and accounting as to certain claims, and dismissing the bill as to others.

Francis W. H. Clay and Melville Church, for complainant.
Philip Farnsworth and Verrill, Hale & Booth, for respondent.
Woodman & Whitehouse, for receivers of respondent company.

HALE, District Judge. This suit in equity brings in question the validity and the infringement by defendant of complainant's United States patent, No. 706,736, applied for December 15, 1899, and granted to Reginald A. Fessenden August 12, 1902, for inventions in wireless telegraphy.

Nearly all that the world knows about wireless telegraphy has been found out within the last 10 years. Its present knowledge is small; but the method of operation commonly employed in the art is simple. The sending station consists of a wire high up in the air on a tall mast. It is like an insect's feeler, and is called an "antenna." It is electrically charged and discharged by an electric spark. Explosive waves then radiate in all directions through the all-pervading substance called ether, just as light is radiated from the sun. These

waves proceed through space with the enormous speed of light, approximately 186,000 miles per second. As they proceed through the ether, they strike a receiving antenna raised up in the air like a feeler causing impulses to run down the wire to the earth. An instrument, interposed in this wire, causes an indicator to operate whenever an impulse passes, giving a signal by indicating dots and dashes. The device which responds to the waves striking the receiving antenna is called a "receiver." It gives information that a wave has arrived. It includes also a "detector," a device by which the electromagnetic waves cause the indicator to respond. Without such detector these waves cannot be seen nor heard nor felt.

In Marconi Wireless Telegraph Company v. De Forest Wireless Telegraph Company (C. C.) 138 Fed. 657, in 1905, Judge Townsend has described the Marconi invention, and has given the history of the art up to that time. One of the complainant's witnesses, Dr. Kennelly, professor of electrical engineering at Harvard University, an authority on the subject of wireless telegraphy, sets out in an interesting way the condition of the art at the time of application for the patent in suit:

"These invisible electromagnetic waves, upon which modern wireless telegraphy depends, move off through free space with the enormous speed of light; and this speed is hardly diminished by the presence of the atmosphere. They present, however, many analogies to these more familiar waves of sound which are carried by the air, and which depend upon the presence of the air for their transmission. Thus, the electromagnetic waves have a certain pitch or rate of vibration, like sound waves. A vertical wire of given dimensions and tension has, like a harp string, a natural pitch, or rate of vibration corresponding to its musical note. A sending mast wire at a wireless station has similarly a certain natural pitch or rate of vibration depending upon the length of the wire, the dimensions and distribution of the conducting surface, and the distribution of any other conductors, such as coils, which may be inserted in the path of the wire. The electrical pitch of such a sending mast wire is commonly very high, and it will emit hundreds of thousands or millions of electrical vibrations per second; whereas, a harp string will ordinarily only emit hundreds or thousands of sound vibrations per second. The operation of electrifying the mast wire and then suddenly discharging it to ground by a spark across the gap corresponds electrically to plucking the harp string. It sets it into vibration."

He proceeds further to describe the receiving arrangements of the wireless telegraph system, as it existed at the date of the Fessenden application. From his description it appears that the mast may be at any place within the sphere of influence of the sending station. This mast supports a wire insulated at the top where it may connect with the metallic surface, and is connected to the conducting surface of the ground at the foot of the mast. In the receiving mast wire is inserted a wave detector, sometimes called a circuit closer or sensitive tube. At the time of the application for this patent it was more commonly called a coherer, and its uses are fully pointed out by Prof. Kennelly:

"This detector, as described in the Marconi specifications, was essentially a gap or discontinuity in the electrical conducting path of the receiving mast wire; but which was capable, on the passage of an electromagnetic wave of 'closing the circuit' of a local voltaic battery, and a telegraph receiving instrument, connected to the tube by the branch wires. Prior to the passage

of an electromagnetic wave this detector, sensitive tube, coherer, or circuit closer would make a gap or open circuit, both in the path of the receiving mast wire to the ground, and in the local circuit of the voltaic battery, the telegraph receiving instrument, and the wires. Consequently, the telegraphic receiving instrument would not respond, or would give no signal, because the local battery had its current cut off at the coherer. When, however, an electromagnetic wave passed by the mast and mast wire, it set up an electric impulse in the mast wire, tending to make a discharge from the latter to ground. This discharge would be prevented by the gap in the coherer. This gap contained loose particles of metallic powder lying in imperfect electrical contact with each other. The electric impulse in the receiving mast wire would, however, in trying to force its way to ground through the coherer, build up an electric pressure or voltage at the gap containing the powder. If this electric pressure or voltage was strong enough, it burst its way through the powder, and caused the particles of metal in the same to cohere, so as to form a good conducting path, and automatically 'close the circuit' of the voltaic battery and telegraph instrument locally connected therewith; so that the telegraph instrument would indicate a signal. If, on the other hand, the electric impulse generated in the receiving mast wire on the passage of the electric wave was not strong enough to burst through the powder and break down the electric discontinuity in the coherer, then the telegraph receiving instrument in the local circuit failed to respond, and the wave went by undetected. In order to restore the coherer to its original sensitive condition and disconnected state, after the telegraphic instrument recorded a signal, automatic means are shown and described in the Marconi patent for agitating the coherer at the same moment that the telegraph instrument gives its click of signal reception."

The electric waves referred to are often called "Hertz waves" or "Hertz oscillations," from the name of their discoverer, Heinrich Hertz. Judge Townsend describes the operation of these waves, and thus refers to the action of the coherer:

"The powder in the tube, when in its normal condition, offers such an amount of resistance that the local-battery current will not pass through it. But when the high-frequency oscillations or waves fall upon it, and surge up and down the elevated conductors, they effect such a transposition in the arrangement of the grains of powder, in a manner not entirely understood, as to weld them together, as it were: the result of which is that the grains resolve themselves into conductive paths, and the current passing through them attracts the vertical arm of the relay, which, contacting with the two points below, permits the current to pass around through the battery, to the telegraph instrument, which records the dash or dot as transmitted and received from the transmitting station. In order to prepare the powder in the tube for the transmission of another signal, the filling must be shaken back into its nonconducting state. This is accomplished by the trembler, which taps the tube, and causes the grains of powder to separate and return to their normal state of high resistance."

It will be seen that it is only when high-frequency waves fall upon the powder in the tube while in its normal condition, and surge up and down the conductor, that the grains of powder in the tube are affected. The learned counsel for the complainant speaks of this action upon the coherer as "knocking down a door." He epitomizes the first idea relating to radiant wave telegraphy in the statement that a wave, snapped off from a vertical wire at one station, struck a similar wire at the receiving station and in passing to ground knocked down an obstruction normally interposed therein and also in a battery circuit, and allowed the battery current to produce a signal.

The testimony indicates that the use of wireless telegraphy began

in the spring of 1897 when Marconi had shown how to get the greatest effect of the explosive wave, and how to quickly restore the coherer after it had been broken down. He made the high potential wave as high as possible, and devised automatic means to replace the stopper, the door in the path of the wave, and battery current, after the wave had knocked it down. Sir Oliver Lodge had also described the use of the coherer. Its action was such that the wave either gave a strong indication, or it did not give any. There was no way of measuring the strength of the wave. If it was sufficient to knock down the door, it registered; if not, it did not register.

So far as has been pointed out, at the time of the application for this patent in 1899 there were in the Patent Office classification of inventions only four United States patents on wireless telegraphy, namely: the Marconi patents, Nos. 586,193, 624,516, and 627,650, and the Lodge patent, No. 609,154.

Marconi refers generally to his apparatus thus:

"According to this invention, electrical signals, actions, or manifestations are transmitted (through the air, earth, or water) by means of oscillations of high frequency, such as have been called 'Hertz waves' or 'Hertz oscillations.' All line wires may be dispensed with."

At another time he further refers to other inventions in the same art, and says:

"Nor am I aware that prior to my invention any practical form of self-recovering, imperfect-contact instrument has been described."

Such instrument was at the foundation of his invention. In referring to it he says that the all-important condition is that in its sensitive state its resistance should appear to be infinite when measured in the manner described by him. By its use, and by his improvements on the work of his predecessors, he succeeded in making distinct and definite signals, and in reducing the art to a system.

Fessenden, the patentee of the patent in suit, distinguishes his invention from that of Marconi, whose receiver he characterizes as a "voltage operated device"; whereas, his own is a "current-operated, wave-responsive device." In his specification he thus compares his invention with the old methods:

"In the methods heretofore employed the electromagnetic waves generated at the receiving station produce voltages in the receiving circuit. These voltages or currents being impressed upon a suitable material normally nonconductive render the same conductive, and thereby permit the passage of a current through a circuit in which said material, usually termed a 'coherer,' is included. After the passage of the voltages produced by each series of electromagnetic waves generated at the sending station, the coherer must be operated in some way to restore it to normal or nonconductive condition. The object of the present invention is to provide for the generation by currents produced by electromagnetic waves of induced currents in a second element or circuit and by the reaction of the current in this second element or circuit on the field formed or produced by the currents in the receiving conductor to produce motion which is directly or indirectly observable."

He refers to the various terms which he uses; inasmuch as there has been some contention in reference to his meaning, I quote fully the description, of his manner of employing technical words:

"The terms 'sending conductor' and 'receiving conductor' are employed herein as indicating all of the circuits from top to ground, if grounded, or, if not grounded, from one extreme end to the other extreme end, including all apparatus in series with the circuits, while the term 'radiating portion' indicates all of sending conductor from top or extreme end of same to point of junction with the apparatus for effecting the oscillatory charging and discharging thereof, such as sparking terminals, transformer coils, armature windings, etc. By 'electromagnetic waves' as used herein is meant waves of a wave length long in comparison with the wave length of what are commonly called 'heat waves' or 'radiant heat.' By 'grounded conductor' is meant a conductor grounded either directly or through a capacity, an inductance, or a resistance, so that the current in the conductor flows from the conductor to ground, and vice versa, when electromagnetic waves are generated. · The terms 'tuned' and 'resonant' are used herein as one including the other. By the term 'current-operated wave-responsive device' as used herein and by me generally is meant wave-responsive devices having all their contacts good contacts and operated by currents produced by electromagnetic waves. They are hence to be distinguished from wave-responsive devices depending for operation upon varying contact resistance."

He further distinguishes his method from the prior art:

"It is characteristic of the method shown that the receiving mechanisms are actuated by currents produced by electromagnetic waves and not by voltages, as in the case of the coherer. Hence when the receiving mechanisms described herein are used in connection with a secondary circuit said circuit is controlled by the currents generated by electromagnetic waves and not by voltages. It is also characteristic that when a secondary circuit is used in connection with the type of wave-responsive device shown in Figs. 3, 4, and 5 that a portion of the secondary circuit is traversed and controlled by currents produced by electromagnetic waves. It is further characteristic of my improved system that the indications produced by the receiving mechanism herein described are dependent upon the total amount of energy emitted to form a signal, and is not, as in the case of the coherer, dependent upon the maximum of the voltage. It is also characteristic of the combination of closed tuned circuits with current-operated wave-responsive devices that the effect on the wave-responsive device is cumulative, i. e., dependent on the total or integral activity of the circuit, and not on the maximum activity or voltage. * * * Since in the arrangement herein described the receiver is constantly receptive, i. e., is always capable of being affected by the waves, and not, as in the case of the coherer, rendered incapable of response to the waves for a portion of the time, the speed of signaling will be increased."

The claims of the patent in suit to which the attention of the court is especially directed are as follows:

"6. In a system of transmission of energy by means of electromagnetic waves, a receiving system including in combination a receiving conductor and a wave-responsive device, the portion of the receiving system containing said wave-responsive device constituting a closed circuit tuned to the frequency of the transmitter, substantially as set forth."

"9. In a receiving system for transmission of energy by electromagnetic waves, a closed circuit tuned to the frequency of the transmitted impulses and a current-operated wave-responsive device, substantially as set forth.

"10. In a system of transmission of energy by electromagnetic waves, a transmitter system including a tuned circuit, said system being adjusted to radiate trains of electromagnetic waves in which a single frequency is predominant, in combination with a receiver system including a closed circuit tuned to said predominant frequency, substantially as set forth.

"11. In a system of transmission of energy by electromagnetic waves, a transmitter system including a closed tuned circuit, said system being adapted to radiate trains of electromagnetic waves in which a single frequency is predominant, and a receiver system including a closed circuit tuned to said predominant frequency, substantially as set forth.

"12. In a system of transmission of energy by electromagnetic waves, the combination of a generator, a grounded sending conductor, a receiving conductor, means for translating the energy of currents produced at the receiving station by electromagnetic waves radiated from the sending conductor into the energy of motion and means for observing or recording such motion, substantially as set forth."

"14. In a system of transmission of signals by electromagnetic waves, the combination of means for generating and radiating, electromagnetic waves at a sending station, a receiving circuit at the receiving station tuned to the sending circuit, and a current-actuated wave-responsive device included in said receiving circuit, substantially as set forth."

"19. In a system of signaling by electromagnetic waves, the combination of a receiving conductor, a secondary circuit, and a current-actuated wave-responsive device controlling the secondary circuit, substantially as set forth.

"20. In a system of signaling by electromagnetic waves, the combination of a receiving conductor, a secondary circuit, and a self-restoring current-actuated wave-responsive device controlling the secondary circuit, substantially as set forth.

"21. A system for signaling by electromagnetic waves having in combination therewith a current-actuated wave-responsive device operative in a closed circuit, tuned to the frequency of the electromagnetic waves to which it is desired to respond, substantially as set forth."

"23. In a plant for the transmission of electrical energy without the use of wires, the combination of means located at the sending station for the generation of electromagnetic waves, and a low-resistance receiving mechanism at the other station operative by the currents generated by the electromagnetic waves, substantially as set forth."

"27. In a system of signaling by electromagnetic waves, the combination at the sending station of a generator, a grounded conductor, a spark-gap, and a condenser connected across the spark-gap so that the condenser and its connecting wires form a local and parallel circuit in resonance to the sending-conductor.

"28. In a receiving system for transmission of energy by electromagnetic waves, a closed circuit of low resistance tuned to the frequency of the transmitted impulses and a current-actuated wave-responsive device, substantially as set forth.

"29. In a system of signaling by electromagnetic waves, the combination at the receiving station of a closed tuned circuit and a current-operated wave-responsive device adapted to give indications proportioned to the total activity of the receiving circuit, substantially as set forth.

"30. In a system of wireless transmission of energy by electromotive waves, an apparatus for utilizing the energy of said waves, said apparatus including in combination a conductor constructed and arranged to cause the energy of each wave to develop electric-current flow, means for rendering said current flow persistent and for co-ordinating the currents developed by successive waves to cause them to act cumulatively upon each other to produce an increased or reinforced resultant current flow, and means operated by said resultant current flow to produce a sensible effect or indication, substantially as set forth.

"31. A system of signaling by electromotive waves, having at the receiving station a current-operated, constantly-receptive, wave-responsive device.

"32. A system of signaling by electromotive waves, having at the receiving station a current-operated, self-restoring, constantly-receptive, wave-responsive device.

"33. A system of signaling by electromotive waves, having at the receiving station a current-operated, constantly-receptive, wave-responsive device, in combination with a closed tuned circuit."

"35. A system of signaling by electromotive waves, having in combination a closed tuned circuit, a current-operated, constantly-receptive, wave-responsive device at the receiving station and a source of persistent radiation at the sending station."

The complainant asserts that the above claims have been infringed by the defendant. The defendant says that the patent is wholly invalid by reason of anticipation; that it does not disclose invention; that it does disclose an inoperative device; and that it has not been infringed.

[1] 1. Does the patent disclose invention?

If there is any invention in the patent it consists chiefly in the fact that a current-operated, wave-responsive device is produced; whereas, the prior art shows a voltage operated device. Marconi represented the ultimate point to which wireless telegraphy had attained. His inventive idea was confined to the use of the coherer. His results were attained by the imperfect electrical contact. Fessenden found the art as Marconi and his predecessors had made it. His idea was to discard the method of operation by the imperfect contact, to use a current-operating wave-responsive device, operating through a good circuit contact, and in this way to make use of all the waves. His purpose was not to use the big waves to knock down the detector, but to have an open door through which every wave could flow, and by which he could have a constantly receptive receiver, affected by all the waves all the time, assuring economy and speed in signaling. It serves no good purpose to discuss the whole field of inventions in the prior art; it seems plain that we may adopt what Judge Townsend has said of Marconi's invention as embodying the last step in wireless telegraphy at the time Fessenden made his invention.

In a large sense every operation by electricity is by current; but the patentee does not leave us to this general use of the word "current." He does not leave us in any doubt as to what he means by "current-operated." He makes his meaning clear in the specification, wherein he clearly draws the distinction between the coherer, the imperfect electric contact of the prior art, and his method of operating by a constantly flowing current. It is urged by the learned counsel for defendant that, inasmuch as all use of electricity is by currents, it did not involve invention to substitute a constant current for Marconi's method of using the gap or imperfect connection; that such change of method was nothing more than would have occurred to the mechanic skilled in the electrical art. But I think the inventor is entitled to the benefit of his own definition of current operation, and to the distinction he has drawn between his method and the imperfect contact of the prior art.

Whatever has been done by Fessenden and by others in improving the instrumentalities relating to wireless telegraphy serves to magnify Marconi's inventive thought. He created a system of definite signals without wires. Judge Townsend thus briefly characterized Marconi's achievement:

"The exact contribution of Marconi to the art of *spark telegraphy* may be stated as follows: Maxwell and Crookes promulgated the theory of electrical oscillations by means of a disruptive discharge. Hertz produced these oscillations, and described their characteristics. Lodge and Popoff devised apparatus limited to lecture or local experiments, or to such impracticable purposes as the observation of thunderstorms. Marconi discovered the possibility of making these disclosures available by transforming these oscilla-

tions into definite signals, and, availing himself of the means then at hand, combined the abandoned and laboratory apparatus, and, by successive experiments, reorganized and adapted and developed them into a complete system, capable of commercially utilizing his discovery."

Prof. Lodge has referred to Marconi's work as building up the art from its early difficult and capricious state to compass great distances and attain comparative dependableness. In doing this, he was the pioneer. His method of operation was by the imperfect electrical contact, the coherer. It does not appear that any other instrumentality within its province had ever been used or thought of by electricians. By it the great waves were detected and translated; the smaller waves were undetected and were not used. After his invention, whoever operated in this art followed Marconi. Fessenden appears to have been the first to undertake by a constant current to obtain the results which had formerly been attained by the imperfect electrical contact; and to make those results more effective. By this new instrumentality he was able to make use of all the oscillations or Hertz waves. It cannot be said that his invention was as broad as the invention of Marconi; but it seems clear to me that it required something far more than mere mechanical skill, even of the skillful electrician, to make use of the constant flowing wave-responsive current instead of the methods of the old coherer. While his invention is not entitled to be pronounced as important an invention as that of Marconi, I think it must be held to be a pioneer invention. He made a new instrumentality in the art, different in conception from the instrumentality which Marconi employed. He took a distinct step. The whole progress in wireless telegraphy up to this time had been through the coherer. Every imitator had assumed that by it alone he could attain results in that mysterious art. Every inventor had directed his inventive thought along its lines. Fessenden found the loose, imperfect-contact, coherer, with its incapacity for economy or of measurement; he substituted for it the current-operated wave-responsive receiver, effecting an unobstructed path, a summing up of all the waves however small, a constantly receptive avenue, an unbroken circuit. He gave a new direction to the progress of the art. In my opinion his inventive thought of transmitting electricity by current waves, and not by voltage, involved patentable novelty of broad design. In making the invention as he has described it, he is entitled to be held a pioneer within his field.

The defendant also contends that, so far as the tuning device is concerned, no invention is found in the patent. It is true that Marconi employed tuning. In his patent, passed upon by Judge Townsend Marconi says:

"When transmitting signals through the earth, I connect one end of the oscillation producer and one end of the circuit closer to earth and the other ends to similar plates, preferably electrically tuned with each other in the air and insulated from earth."

In this tuning he was adjusting his sending and receiving conductors, antenna to antenna. It is claimed by complainant that the tuning of Fessenden's invention is totally and typically different in

purpose and in operation. It is urged that Fessenden employs a four-circuit tuning which syntonizes the generating circuit, the radiating antenna circuit, the receiving antenna circuit, and the closed circuit associated with the detector; and that by such quadruple tuning he develops an increased and cumulative current. Upon the subject of tuning Dr. Kennelly testifies:

"It was the practice in wireless telegraphy * * * to adjust the sending and receiving mast wires to each other for maximum mutual effect, i. e., to tune them, prior to the date of the application for the patent in suit; but, so far as I am aware, this tuning was necessarily of a crude and imperfect character, owing to the erratic and variable electrical conditions of the coherer or loose-contact receiving device. The best adjustment or tuning suited to the condition of open circuit at the coherer was necessarily different from the best adjustment suited to the condition of closed circuit in the coherer. Consequently, precise adjustment for a maximum effect, or precise tuning, never was attainable in the coherer days of the prior art. Moreover, the utility of tuning between the sending and receiving mast wires with the coherer was considerably lessened, because of the noncumulative current action of the device; there was no appreciable current until the detector responded, and then no amount of current impulses in the same wave train produced any more effect in that signal. The introduction of current-operated wave-responsive devices, with uniform open-door conditions in the detector, have not only made tuning much more effective than before in increasing the strength of received signals, by reason of the cumulative current action of the device; but they have also considerably increased the degree of precision with which tuning could be effected between the sending and receiving stations, owing to the steadiness of electrical conditions with good-contact wave detectors, as against loose-contact coherers.

"So far as I am aware, the patent in suit is the first disclosure in the art of wireless telegraphy of a wireless telegraph system in which the sending and receiving apparatus is adjusted to its mutual maximum effect, not merely with the adjustment of mast wire to mast wire, as in the prior art, but with the reinforcement due to the additional effect of a tuned local circuit, including the spark-gap at the sending station and a tuned local circuit, including the detector at the receiving station. A fortiori, I believe it to be the first disclosure in the art of wireless telegraphy of the above conditions in conjunction with a current-operated wave detector."

Dr. Kennelly further points out that the presence of the coherer is inconsistent with the complete tuning which is had under a current-operated wave-responsive device.

It must be remembered that the imperfect electrical contact was at the basis of electric space telegraphy. Until Fessenden made his invention there had never been a wireless telegraph system except such as employed the voltage operated coherer. Current did not affect this system; no tuning whatever could be had in it except to get the two antennæ into resonance with each other. This could have no reference to tuning for the purpose of accumulating current effect on the receiver. In order to do this the coherer must be taken out of the road upon which the current had to travel.

In his work on "Signaling Through Space," Sir Oliver Lodge said:

"For the most distant signaling the single pulse or whip-crack is the best, and this is what in practice has hitherto always been employed; but with it tuning is of course impossible."

The coherer involved a gap in the circuit. What was wanted in that system was to have all the energy of the train of waves

bunched into one wave, so as to knock down the obstruction of the detector—to "weld" it into a good contact, and let the current through it. Fessenden's purpose was the exact opposite. He sought to augment the current effect, so that he would get the sum total of all the energy received. Marconi's idea was to tune for the purpose of getting a big wave. Fessenden's was to make a current out of all the waves. In his system, as the complainant points out, the current-operated wave-responsive device is always in the circuit that is to be tuned, is a part of that circuit, and is of constant resistance. The current of the circuit passes through it all the time. With the presence of the coherer all the tuning that could be done was from mast to mast. Complete tuning was possible only in such a system as that of Fessenden. I am of the opinion that the tuning of the prior art was essentially and typically different from the tuning involved in Fessenden's invention. I am of the opinion that the claims in the patent which present and describe tuning involve invention, and must be sustained as valid claims.

[2] 2. Is the patent in suit void by reason of anticipation?

The defendant urges that the inventive idea of the patentee was anticipated by Marconi, and also by Lodge, both in his United States patent and in his British patent. Each one of these patents shows a device employing a coherer or circuit closer. I have already referred to Fessenden's definition of terms wherein he says that by "current-operated wave-responsive device" he means "wave-responsive devices having all their contacts good contacts, and operated by currents produced by electro-magnetic waves"; he distinctly says that they are to be distinguished from wave-responsive devices depending for operation upon varying contact resistance. The Lodge and Marconi patents employed the circuit closer. If their devices were ever at any time wave responsive, they depended for their operation upon varying contact resistance. For certain purposes Sir Oliver Lodge removed the coherer from the path of the receiving circuit and placed it in a derivative circuit into which there could be an overflow of the energy accumulated in the receiving circuit. In respect to tuning, his object was to secure precision of tuning between the transmitter and a single receiver, and also to enable the operator to adjust the transmitter to various receivers at different receiving stations, thus securing what he called "selectivity"; but I cannot find that he ever discarded the coherer, or that he effected the tuning of the various circuits by a complete syntonizing of the whole system which was the inventive thought of Fessenden, and to which I shall hereafter refer. I have been greatly interested in what Prof. Pierce has said of the work of Lodge; but, from the study I have been able to give it, I am not satisfied that he achieved anything which is anticipatory of the patent in suit. The learned counsel for the defendant have brought to our attention other instances of alleged anticipation in the prior art which, in my opinion, need not be discussed in detail. I think it is enough to say of them that they all present varying contact resistance, and are not anticipatory of the Fessenden device. It seems

clear that nothing pointed out to me in the prior patented art should be held to anticipate the patent in suit.

Outside the patented art, the defendant relies upon certain publications as anticipatory of this invention. It cites a printed article by Northrup and Pierce, which appeared in the Electrical World in two installments, beginning in December, 1897. It is not contended that there had been any prior use of the patented invention by Northrup and Pierce; they have testified merely to anticipation by certain publications. Giving Northrup and Pierce the whole benefit of their testimony, I think they fail to show any anticipation of wireless telegraphy. It is not necessary to enter upon a detailed description of the alleged anticipations. So far as anticipation consists in printed articles, it is sufficient to say that those articles do not meet the recognized test clearly set out in Badische Anilin & Soda Fabrik v. Kalle et al. (C. C.) 94 Fed. 163, where it was held by Judge Coxe that:

"A description which is insufficient to support a patent cannot be relied upon as an anticipation. Unless the prior publication describes the invention in such full, clear, and intelligent terms as to enable persons skilled in the art to comprehend it, and reproduce the process or article claimed, without assistance from the patent, such publication is insufficient as an anticipation."

See, also, Cohn v. U. S. Corset Co., 93 U. S. 366, 23 L. Ed. 907.

From a careful study of the record, I am persuaded that the defendant has not met the burden of showing that the patent is void by reason of anticipation.

3. Has the patent in suit been infringed by the defendant?

Several forms of defendant's apparatus are exhibited in court. It has been pointed out that in one of them the form of receiver shows an open door for all incoming electromagnetic wave trains by the closed receiving circuit extending from the antennæ to the ground. The coil is interposed in the grounded primary receiving circuit. It forms also part of the secondary circuit which includes a condenser and a detector. Only the lower half of the coil—the part below the contact—is included in the primary circuit; while not only the lower half, but a part of the upper half of the coil, namely, the part between the contact and the similar contact on the opposite side of the coil, are included in the secondary circuit. It results that, when oscillatory currents are surging in the primary circuit, a part of the coil that is in the primary circuit affects inductively the upper part of such coil which is in the secondary circuit only, thus producing induced oscillatory currents in the secondary circuit, including the detector. The complainant properly claims, I think, that we have oscillatory currents resulting from all, and not from some only, of the waves of the train of electromagnetic waves admitted through the open door, and surging back and forth in the primary circuit, and also similar corresponding induced oscillatory currents surging back and forth in the secondary circuit, including the good contact detector. A careful examination of the record leads me to believe that the learned counsel for the defendant is hardly justified by the

189 F.—47

testimony in making the claim that, owing to the physical properties of carborundum, this oscillatory current in secondary circuits can pass through the detector only in one direction, and not in the other. Certain evidence in behalf of the defendant confirms the statement that this detector allows a feeble current to pass in both directions, although more easily in one direction than in the other.

The learned counsel for the defendant have not distinctly pointed out to me how far defendant's apparatus is based upon patents, and how far such apparatus is unpatented. They make the broad claim that, whether patented or unpatented, the forms of the apparatus which are shown to me do not infringe the patent in suit. From a careful study of the record I cannot sustain this contention. It seems to me that every element of the invention of the patent is found in defendant's apparatus. I think the testimony sustains the contention of the complainant that the grounded primary, oscillatory-current circuit presents the open door to all incoming waves. The induced oscillatory circuit through the detector is always closed for the passage of currents corresponding to those produced in the primary circuit, and not normally open as in the coherer. It is therefore constantly receptive. As the receiver is susceptible to the action of every current, large or small, and is not dependent for action upon high voltages, it is current-operated, and not voltage-operated. It responds to the action of all the waves of a train, instead of only to some of them; and so it is wave-responsive. It enables the effect of all the waves to be added together; and so it is cumulative. In regard to the defendant's infringement as shown by the apparatus exhibited in court, Dr. Kennelly testifies:

"I find that the defendant's apparatus complained of employs current-operated wave detectors. These detectors, in the physical exhibits in evidence, are so-called crystal detectors; that is to say, they consist of lumps of material, usually crystalline in character, tightly gripped between appropriate contacts. From a structural standpoint, these wave detectors differ from the detectors set forth in the patent in suit, which are not lumps of crystalline material, but coils of wire of certain form and dimensions. Nevertheless, the defendant's detectors are current-operated detectors and belong to the same class as that disclosed in the patent in suit, since they do not change their electric conducting properties from wave to wave, but behave to one wave in a group as impartially as they behave to another, having good contacts instead of poor, shaky, or powder contacts. Moreover, they translate the energy of received waves cumulatively into energy of motion of such a character as to be recognized by the senses, i. e., by the ear, listening to the sounds of signals in the telephone. I agree with defendant's expert, Dr. Northrup, in so far as he speaks of the defendant's wave detectors in the following terms: * * *

"Defendant's apparatus, however, differs from these disclosures, in that the detector is a perfectly passive piece of material which suffers no change of resistance or physical character like the coherer, and is a detector which will operate to give good signals even though no local battery be used, showing that its valve action is such as to enable the incoming energy of the radiation itself, to be the source of the signal. The coherer might be termed a trigger which the radiation touches off, but defendant's rectifer is not of this character, being a passive converter of the form of the received energy such that this received energy will itself operate a 'phone.'

"In the above statement I concur, and I consider that it is in conformity with the disclosures of the claims of the patent in suit in so far as relates to the nature of a wave detector per se. At the date of the application for

the patent in suit, the coherer was in universal use, I believe, in wireless telegraphy, and I believe the patent in suit is the first disclosure in the art of an announcement that the art was on the wrong track, and that current-operated wave detectors should be used, together with examples of such current-operated wave detectors."

It is contended by the defendant that the detector shown in its apparatus is a high-resistance detector, and that, in some of the claims of his patent, Fessenden described a low resistance receiving mechanism, and that therefore defendant's high-resistance detector does not infringe those claims of the patent which call for a low-resistance mechanism. It appears in fact that some of the claims in Fessenden's patent are confined to a low-resistance mechanism, while some are unlimited as to resistance and cover high as well as low resistance. Beyond this, I think, the term "low resistance" as used by the patentee is intended to mean "low," as compared with the infinitely high resistance of the coherer, the resistance upon which Judge Townsend commented in the passage to which I have already referred. Language is to be interpreted from its association. The patentee was talking about the coherer and its infinite resistance, and spoke of low resistance in contradistinction to the infinite resistance of the Marconi coherer. I think it must be said that, following out the clear intention of the patentee, all the resistance the apparatus shows is "low resistance," according to the fair interpretation of language. In general terms it may be said that the defendant asserts his apparatus not to be a current-actuated wave-responsive device. It is clear that there is involved in voltage operation the idea that the potential current is used to knock down an obstruction; in other words, to create a condition that will allow flow of the current; or, as the complainant puts it, "to make a bridge for the current to flow." From a careful study of the record it seems clear that in the defendant's detectors such bridge is already made and traveled upon. It appears that defendant's receiver is current-operated, and differs from the coherer of the prior art. Marconi and his predecessors treated the coherer as a circuit closer. Examination of the evidence before me leads to the conclusion that in the defendant's device, as in Fessenden's, there is no circuit closer; for the circuit is never broken. I think it clear that the defendant's devices, under whatever patent they are claimed, are not based upon the principle of the coherer. They are current-operated wave-responsive devices like the complainant's; as such, in my opinion, they infringe claims 12, 19, 20, 30, and 32 of the patent in suit.

The defendant says, in any event, that it cannot be held to infringe Fessenden's system of tuning. "Tuning" is a term taken from the musical art. I follow the definition given by the learned counsel for the complainant. He says that it implies the equalization of frequencies of vibration of wave lengths. Its advantage in wireless transmission is that the current in a circuit, having a natural frequency of oscillation, grows in strength if the successive impulses received from the outside are tuned exactly to its natural frequency. Every oscillatory current that flows has a natural frequency of oscillation peculiar to itself. As the learned counsel for complainant

suggests, its oscillations may be weak, but they are there; and if we bring into sympathetic relation with the weak oscillatory current a stronger oscillatory current, of the same frequency, we necessarily increase the amplitude of the oscillations of the weak current; or, in other words, we make those oscillations stronger and their power more marked.,

I have already pointed out that attempts at tuning in the prior art were merely to make the receiving conductor resonant to the sending conductor. Marconi's idea in tuning appeared to be to prevent interference between such stations as were not intended to cooperate. Sir Oliver Lodge effected certain precision of tuning between stations, but his inventive thought did not go to the extent of Fessenden's in effecting the quadruple tuning that is pointed out as a part of the system of the patent in suit. Fessenden went much further than anything in the prior art. His purpose was to put every part of his system into touch with every other part; he desired to tune so as to call or receive communications from any desired station in or out of tune with a given station at the time. He sought to properly adjust his tuning apparatus to effect these results. Dr. Pierce and other experts have admirably set forth the work of Prof. Lodge in this regard; but their statements fail to convince me that the tuning of Prof. Lodge was in type or in purpose the complete tuning of the patent in suit. Dr. Kennelly has well summed up the important elements of the patentee's tuning. He points out that the tuning of the patent is the adjustment not only of mast wire to mast wire, but that there is added to it the additional effect of a tuned local circuit, including the spark-gap at the sending station, and the detector at the receiving station. He says that the tuning of the patent was never attainable in the coherer days of the prior art. The defendant contends that it avoids infringement of the Fessenden system of tuning by not having a tuned closed local receiving circuit in which its detector is located; but the testimony leads me to the conclusion that the defendant's apparatus does in fact contain a closed local circuit. I do not think it necessary to discuss with particularity the evidence which leads me to this conclusion. The defendant undertakes to make the point that the resistance of the crystal detector in the local circuit is in each case so great that the circuit is practically open. It is sufficient to say that, on a careful examination of all the testimony, I am satisfied that this contention cannot be sustained. From the whole evidence I am of the opinion that the defendant's tuning is not simply the crude tuning of Marconi and his predecessors, but is substantially the tuning of the complainant's patent as covered by claims 6, 9, 10, 11, 14, 21, 27, 28, 29, 33, and 35.

It cannot be said that the invention of Fessenden presents a solution of all the great problems of electric telegraphy without wires. It does not bring a realization of all that the great workers in electrical science have dreamed. The books of Pierce, Kennelly, Fahie, and others have been brought to my attention in the study of this case. I have read them with great interest. They are full of suggestion. They open avenues for thought and investigation. No man

can now tell what future students may produce. It cannot be claimed that this patent does more than to open a little wider the door of invention in the art of wireless telegraphy.

After a full examination and study of the record and of the elaborate and enlightening briefs of learned counsel, I come to the conclusion that the patent in suit is an operative patent, disclosing invention; that it is not void by reason of anticipation; and that claims 6, 9, 10, 11, 12, 14, 19, 20, 21, 27, 28, 29, 30, 32, 33, and 35 have been infringed by the defendant.

A decree may be entered for the complainant upon the above claims, for an injunction, and for an accounting, and dismissing the bill as to claims 1, 2, 3, 4, 5, 7, 8, 13, 15, 16, 17, 18, 22, 23, 24, 25, 26, 31, and 34. The complainant may recover its costs.