KINTNER et al. v. ATLANTIC COMMUNICATION CO. et al.

(District Court, S. D. New York. January 7, 1916.)

1. PATENTS ⊕═157(1)—CONSTRUCTION—SCOPE OF INVENTION.

In a new and rapidly developing art, when the date of an invention and the clarity of disclosure are in serious controversy, the courts must be vigilant to prevent a result by which after-acquired knowledge gives to a patentee that valuable control which would not have been his but for a later, or, if not later, a newly expressed, thought which he seeks to antedate.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229, 230; Dec. Dig. ⊕═157(1).]

2. PATENTS ⊕═157(1)—CONSTRUCTION—GENERAL PRINCIPLES.

In patent cases, where advances in respect of health, safety, and comfort of living are concerned, the public has a real as well as a theoretical interest. On the one hand, it is essential to the welfare of the country that inventors shall not be discouraged by narrow interpretations when they have made a worth-while contribution; but, on the other, the public are not to be deprived of the full enjoyment of what becomes rightly theirs because the advance is a mere improvement, or, if more than that, because the inventor has not made a full and clear disclosure, or has failed to obtain a contract with the government which defines what he may later claim.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229, 230; Dec. Dig. ⊕═157(1).]

3. PATENTS ⊕═328—VALIDITY AND INFRINGEMENT—METHOD AND APPARATUS FOR WIRELESS SIGNALING—"STATIC."

The Fessenden patents, No. 918,306, for a method of wireless signaling, and No. 918,307, for an apparatus for wireless signaling, the principal purpose of which was to overcome the effect of atmospheric disturbances or "static" by a combination of high spark frequency and definite or regular spark frequency, with a receiving apparatus consisting of an indicator resonantly unresponsive, or an ordinary telephone, were not the first to disclose either high or regular frequency, both of which were known and practiced in the prior art and the patents, as to claims 1 and 3 of the former and claims 1, 2, 3 and 4 of the latter, are void for lack of invention; such claims also held not infringed, if conceded validity.

In Equity. Suit by Samuel M. Kintner and Halsey M. Barrett, receivers of the National Electric Signaling Company, against the Atlantic Communication Company and others. On final hearing. Decree for defendants.

Suit for infringement of claims 1 and 3 of United States letters patent No. 918,306 (method), and claims 1, 2, 3, and 4 of No. 918,307 (apparatus), each granted to Reginald A. Fessenden on April 13, 1909.

Frederick W. Winter, of Pittsburgh, Pa., and J. Edgar Bull and Herbert G. Ogden, both of New York City, for plaintiffs.

Harry E. Knight, of New York City, Frederick P. Fish, of Boston, Mass., Hector T. Fenton, of Philadelphia, Pa., and Philip Farnsworth and W. H. Pumphrey, both of New York City, for defendants.

MAYER, District Judge. This voluminous record is not so formidable as it looks, and while the questions under consideration are highly interesting, yet many important facts are either uncontroverted or not seriously in dispute. The extensive record is due partly

to the introduction of testimony as to prior use, either not presented at all or only passingly and inconclusively in a previous litigation, and partly to the desire of the court and counsel that this record shall contain all there is—in the hope that the final determination in this suit may end the controversy.

Before undertaking the technical discussion here involved, it is desirable to outline the mental attitude with which the subject must be approached, even though such outline suggests observations, more or less trite, to those familiar with the law of patents. The radio art (as wireless telegraphy is now called) is, at the outset, so mysterious to the layman that even its fundamentals still seem wonderful, and what to the scientist may appear to be but natural progress may carry an exaggerated importance to an unskilled mind. It is therefore vital to have a clear understanding of the state of the art, and at least to endeavor to perform that difficult feat of mental gymnastics whereby a lay mind presumes to understand, first what was known to that much referred to person "the man skilled in the art," and next whether what was done went beyond the ken of that same person.

Fortunately, in this case, we have an extraordinary array of men of super-scientific attainments, some of whom have spoken through their writings and others in the flesh, and, with the court transformed into a university classroom, it has been a liberal education to listen to the noted scientists who have appeared, either as experts or as fact witnesses, as well as to the many fine upstanding men whom the government and the wireless telegraph companies are fortunate enough to have in their service from officers to operators. From hearing what these men have said and reading what they and others have written, the case must be approached with the realization that "the man skilled in the art" possessed a high order of knowledge and attainment and that something profoundly abstruse to men less qualified may have been the noninventive, although useful, step forward.

[1] It is also important to remember that in the early stages of an art of this kind discoveries are being made rapidly and constantly, and therefore the file wrapper assumes an importance which is often absent in many cases; for when the date of an invention and the clarity of disclosure are in serious controversy the courts must be vigilant to prevent a result by which after-acquired knowledge, in a swiftly developing art, gives to a patentee that valuable control which would not have been his but for a later, or, if not later, a newly expressed, thought which he seeks to antedate.

[2] Finally, although at times, in some patent cases, much concern is expressed in argument about the rights of the public in regard to some alleged invention, without which, up to that time, the public had lived with philosophic complacency, yet in cases where advances in respect of health, safety, and comfort of living are concerned, the public has a real as well as a theoretical interest. On the one hand, it is essential to the welfare of the country that inventors shall not be discouraged by narrow attitudes and interpretations when they have made a worth-while contribution; but, on the other, the public is not to be deprived of the full enjoyment of what be-

comes rightly theirs because the advance is a mere improvement, or, if more than that, because, through no fault of theirs, the inventor has not made full and clear disclosure, or has failed to obtain a contract with the government which defines what he may later claim.

[3] With these views in mind, I take up the discussion of the patents in suit. In the early history of the art, signaling by wireless was much embarrassed by atmospheric disturbances, or "static," as it is called. To the overcoming of this difficulty the two patents in suit, one for a "method of wireless signaling" and the other "for apparatus for wireless signaling," are directed.

The method patent was applied for on July 1, 1907, and was issued April 13, 1909. The apparatus patent (divisional) was applied for August 25, 1908, and was issued also on April 13, 1909.

"Great difficulty," said Fessenden, "has been experienced in wireless signaling on account of electric disturbances, more particularly atmospheric disturbances. In the tropics, for example, stations equipped with the usual type of apparatus as a rule are unable to work at all for months at a time, except at brief intervals, and even in the more northern climates the same difficulties occur during the summer months. By my apparatus and method herein described I succeed in annulling the effects of disturbances, and more particularly such atmospheric disturbances."

In the method patent there were four claims, two of which are here in issue as follows:

"1. In the art of wireless signaling, the method of eliminating disturbing impulses which comprises generating waves having a definite frequency, in groups having a definite group frequency above 250 per second, but within the limits of audibility, and receiving the same with an indicator resonantly unresponsive to said group frequency."

"3. In the art of wireless signaling, the method of eliminating disturbing impulses which comprises generating waves having a definite frequency, in groups having a definite group frequency of approximately 1,000 per second, and receiving the same with an indicator which is unresponsive, resonantly, to said group frequency."

In the art, there must be a transmitting instrumentality and a receiving apparatus; for wireless telegraphy consists in sending through the ether the electro-magnetic wave known as the Hertzian wave, which is heard at the receiving end. Translated into plain English, "an indicator resonantly unresponsive" to the group frequency transmitted means an ordinary telephone. "Group [or spark] frequency" means the number of times per second that the ether is agitated, such as by means of recurrent sparks, and is not to be confused with "wave frequency." A "wave train" means the electric waves radiated during one set of oscillations. If more than one, the wave trains radiated during one-half cycle of the charging current are called a group of wave trains. What Fessenden claimed, according to plaintiffs, may therefore be colloquially stated thus:

"If you watch my method, you will learn that the electric spark recurs at regularly spaced or definite intervals, that I produce over 250 sparks per second in this definite or regular manner, and that at the other end the sound reaches a human being who has a telephone receiver held to his ear. I never generate so many sparks per second as to produce a sound beyond the limits of audibility, and I further inform you, among other things, that when I produce approximately 1,000 sparks per second, regularly spaced, I am simply

particularizing in respect of one of the group frequencies which I use, and which you will find effective in overcoming static." ·

An elaborate description of the details of the transmitting and receiving apparatus need not be here given. The uninitiated will find very interesting statements of the underlying principles of the radio art in Marconi Wireless Telegraph of America v. National Electric Signaling Co. (D. C.) 213 Fed. 815, Marconi Wireless Telegraph Co. of America v. De Forest Wireless Telegraph Co. (C. C.) 138 Fed. 657, and National Electric Signaling Co. v. United Wireless Telegraph Co. (C. C.) 189 Fed. 727, and in the Navy Manuals.

In addition to these will be found the opinion of Judge Buffington in National Electrical Signaling Co. et al. v. Telefunken Wireless Telegraph Co. of United States, 208 Fed. 679, 125 C. C. A. 647, discussing the same patents as are here in issue. That opinion is of great value as an introduction to this case, and I should have no hesitation in concurring with its conclusion, had the court in that case had before it certain material testimony, there omitted and here included, which vitally changes the whole aspect of the controversy, both in regard to validity and infringement.

It is plain that the court there was led to believe that Fessenden was the first to realize the value of high frequency in combination with a resonantly unresponsive receiver, and, indeed, the court said:

"For as we have seen, and *in the then state of aural knowledge*, it would have been regarded as destructive to have coupled such high spark frequency with nonresonant receiving."

In the case at bar, it is and must be conceded that the combination of high frequency and a telephone receiver was well known and had been used extensively in practice, and this fact is now uncontroverted because of overwhelming evidence which was not presented in the suit in the Third circuit.

I fully agree with Judge Buffington that that combination involved invention; but the difficulty is that Fessenden was not the inventor of this notable contribution to the art, and therefore this case turns on the meaning and value of Fessenden's "definite" group frequency. It is now said that Fessenden was the first to realize and disclose that the group or spark frequency must not only be high, but regular; that this regularity of high frequency sparks produces a musical note, which enables the operator to concentrate his attention on that note, so that he can distinguish the signals from the queer, irregular noises of static.

A reading of the opinion of Judge Buffington clearly shows that either the court did not attach any importance to the regularity of spark frequency or took it for granted, and this is readily understood when, on an examination of the briefs of counsel in that case, it will be seen that while references are made to that subject they were either (a) to "definite," as meaning "predetermined," or (b) as if the element were old and well known, or (c) as incidental and wholly subordinate to the major proposition that the discovery consisted in using high frequency sparks with a telephone receiver.[1]

---

[1] Space will not permit extended analysis of this summary. Defendants' briefs set this forth elaborately.

What lends a touch of dramatics to the case is the experience on the night of December 11, 1905, of Iredell, a De Forest operator at San Juan, Porto Rico. At this time the Marconi and the De Forest Companies had various stations throughout the country, and a considerable number of vessels, navy and merchant, had been equipped with wireless apparatus. Iredell at one time had been a telegraph operator, and was employed at San Juan by the De Forest Company from about October, 1905, until April, 1906. While he was unable to produce his log of December 11, 1905, there cannot be any question that his report describing what he heard is accurately set forth in the following letter of Admiral Dunlop, dated January 6, 1906, and in Iredell's answer, of January 7, 1906:

"U. S. Naval Station,
"San Juan, Puerto Rico, January 6, 1906.

"Mr. W. G. Iredell, New Long Distance Wireless Station, San Juan, P. R.— Dear Sir: The Bureau of Equipment, Navy Department, has asked me to report on the receipt of a signal which was received at this station, from overhauling a report made from the wireless station on December 11th at 10:15 p. m., in which the following was reported:

" 'Heard a new spark. Never heard it before. Was making signals Boz in the Continental code. Caught the words "spark—do you get— How does our spark sound."

" 'At 10:30 there were several sparks sending, one sending Boz in the Continental code, and another Slaby-Arco spark sending in Continental, and a third low frequency spark, which sounded like a De Forest long-distance station.

" 'At 10:44 heard Boz repeated frequently, also two others, one making D's— probably S. L. (Colon De Forest station).

" 'At 10:51 heard the same.

" 'At 10:52 Boz came in better and repeated the following message several times, "Metallasi. Wire receipt of these messages," then repeated Boz.

" 'At 10:58 said Boz again until 11 p. m. He then made several other signal letters and stopped at 11:08.

" 'At 11:19 heard the same spark making D's a few times. Came louder than before and stopped at 11:20. Between 11:20 and 11:25 heard a spark which sounded like R K (Pensacola).

" 'Listened until 11:35.'

"2. The Bureau wishes to learn what the strength of the signal was and any particular characteristics of the same as received at San Juan.

"Very respectfully,                    [Signed]  A. A. Dunlop,
Rear Admiral U. S. N., Commandant."

"San Juan, P. R., Jan. 7, 1906.

"To Admiral Dunlop, Commandant, U. S. Naval Station, San Juan, Puerto Rico—Dear Sir: Replying to your favor of January 6th regarding the 'Boz' signals, permit me to state that these are the same as are referred to in subsequent reports as being made by 'JN.' These signals are still being heard, but the sender seems careful to conceal his identity.

"The signals vary a great deal in strength, some periods coming in faintly, or not heard at all, and at other times coming stronger. He changes his tune every fifteen minutes. The spark is of high frequency and regular periodicity.

"Very respectfully,                    [Signed]  G. S. Iredell." [2]

That the Brant Rock note heard at San Juan was musical there can be no doubt; that it produced a marked impression on Iredell must

---

[2] Tune means wave tuning. I am satisfied, in view of the context, that "periodicity" means schedule.

230 F.—53

likewise be unquestioned; that it was not the note disclosed by the patent was abundantly .demonstrated by the experiments during the trial, the file wrapper, and by the testimony as to the motor generator then used and the consequent cyclage and spark frequency.

In the prosaic surroundings of an equity courtroom we sit in wonderment as we hear tales of accomplishment which make Jules Verne commonplace and suggest that H. G. Wells is a conservative prophet, and it is not surprising that in the silent watches of the night, as Iredell sat in the wierd environment of a radio station, this Brant Rock note made a profound impression. He was an intelligent man, with some knowledge of music and a fair, but not extensive, experience in radio, and in those days operators were watching for every new sound, and, indeed, for every new development, and, accustomed as Iredell was to low frequency sparks, the Brant Rock note would naturally have challenged his attention; for, while Iredell heard many sparks, he had never listened to the signal of the U. S. S. Kentucky or of the Galilee station of the De Forest Company near the Highlands in New Jersey. But what had so markedly and naturally impressed this man, who was an operator, but not a scientist, either did not impress the scientist, Fessenden, or failed as yet to suggest to him that he had solved the problem, as now claimed, or that he knew what he had accomplished sufficiently well to instruct the art.

Let us see what Fessenden said and did at this time. Under date of December 19, 1905, the Navy Department, referring to the "new spark" of December 11th, wrote to the National Electric Signaling Company at Brant Rock, inquiring "if any of your stations were sending the above at the time given, and what station it was." To this Fessenden answered:

"Brant Rock, Mass., Dec. 22, 1905.

"Bureau of Equipment, Navy Department, Washington, D. C.—Sir: 1. Replying to your letter of Dec. 19th, I would say that the messages received at San Juan were sent out from our station at Brant Rock. I inclose report of messages sent out Dec. 11th.

"2. The reason for the operator stating that he heard a new spark is because on that night we sent for the first time on a new selector, which gives a spark of a different sound from the old selector. We inclose report. I would say that the amount of radiation sent out with the new and old selectors is practically the same, but the new selector gives a clearer pitched note.

"3. This company would be pleased to learn what the strength of the signals was as received at San Juan."

The "new selector" was a synchronous rotary gap, which undoubtedly gave a regular spark frequency; but not a word was said by Fessenden as to the frequency used, and not a word as to a "musical" spark. The emphasis was on a "clearer pitched note," and the inquiry was as to "the strength of the signals." At that time, therefore, taking the most favorable construction to plaintiffs, Fessenden either did not know the true reason for the Brant Rock note, or, if he knew, then he withheld his full information from the world. Of course, he had a perfect right to withhold his information until he could secure himself by a patent; but, to establish the true date of an invention, the fact must be proved, and guesses are not permissible.

The conclusion, however, is irresistible that then and as time went

on he believed the solution was in ascertaining what high frequencies could be attained and used so as to cause the listener to concentrate on these "higher notes to such an extent that the low noises made by atmospheric disturbances ceased to affect the consciousness," and, if he thought that a musical note created because of regular spark frequency was essential to that ideal, he certainly failed to say so until long after. The truth of the matter is that Fessenden at that time either attached no importance to definite spark frequency or regarded it as so well known as not to constitute an element in a new combination.

Now, the Brant Rock note, although the subject of inquiry and comment, did not contain the invention; for it must not be forgotten that the claims call for a spark frequency higher than 250. Brant Rock, Mass., was an experimental station established by the National Electric Signaling Company under the professional charge of Fessenden. A station for long-distance work had been established at Machrihanish, Scotland.

According to Fessenden, the first set of apparatus installed at Brant Rock was a 7 k. w. or a 7 k. w. to 10 k. w. at 60 cycles. This set he testified was later (about January, 1906) speeded up to 120 cycles, and with that gave about 25 k. w. That set was used for years, until the company got 500 cycle sets early in 1909. (Testimony of Edwards, pp. 2229, 2230.) The evidence is overwhelming that the Brant Rock spark frequency in December, 1905, was 240 or at best 250, although to be accurate I should say 246. Claubitz, who left Brant Rock in July, 1905, for Machrihanish, where he remained about two years, seemed to be an impartial witness, and from his testimony it would appear that the cyclage at Brant Rock and Machrihanish was not to exceed 123 or 246 spark frequency.

The testimony of Iredell that the signal of December 11, 1905, corresponded to D on the violin string (equivalent to a frequency of 288), is truthful, but not reliable, for the ear in such matters is a shaky guide to accuracy. The single test card out of a number made by Bennet (the assistant of Fessenden), before the machine was purchased, and showing 253, is too isolated an instance to negative the proposition that a machine of 120 cycles will normally produce a spark frequency of 240, or at best, in practice, not to exceed 250. The result is that what Iredell heard was a note of a frequency under 250, but of a musical character, because reed or saxophone like; but that is not the note of the specification and the claims, which call for a higher frequency.

More than that, Fessenden's work was still highly experimental, as is made clear by many witnesses, and especially in Iredell's report that "the signals vary a great deal in strength, some periods coming in *faintly* or *not heard at all,*   *   *   *;" and this statement, we will find, was later confirmed by Fessenden in his application for letters patent. (Page 2, line 30.) But at this time, while Fessenden was experimenting, much was already known. Whether Fessenden knew what De Forest and the Navy were doing is, of course, immaterial; but they had accomplished much. De Forest had been a liberal con-

tributor to scientific magazines and discussions, beginning at least as early as 1901. These need not be reviewed in respect of the subject of high frequency, for he sums up his observations and experience of years, concisely and relevantly, in remarkably simple language, in his now famous book of instructions to his operators.

It is established that these instructions were drafted by De Forest in the summer or fall of 1905; that 100 books were printed by September 26, 1905, and widely circulated; that Humphrey, a printer, received the order to print a second edition on November 3, 1905; and that the books were delivered by Humphrey on November 20, 1905. It cannot be questioned that the instruction book was public property before December 11, 1905. So also with the Shoemaker book, and about the same time a compilation made up at the Brooklyn Navy Yard. (Defendants' Exhibit 245.) De Forest said:

"The length of spark gap determines the amount of energy, to a large extent, employed and radiated, and thus the distance which can be covered.

"With ordinary installations having antennæ 150 feet or more in height, one-inch spark gap should be sufficient for 100 miles. For relatively short distances it may be desirable to cut down spark gap to one-quarter inch or so. Under no circumstances widen spark gap above 1¾ inches, to avoid puncture of condenser. These extremely wide gaps should seldom be used with 1 k. w. sets.

"It is well to know that the length of spark determines very largely the sound frequency of the spark or the number of sparks per second, and that a high frequency spark is much more readily distinguished through atmospheric and other interferences. It may be well, therefore, under one condition, to shorten spark gap until the frequency of the spark is quite high, even if this shortening decreases distances over which signals can be heard.

"It may thus be possible to read a weaker signal of high frequency through static disturbances, when a low frequency spark, even though much louder in sound, could not be read through the same disturbances.

"Operators using good judgment in such matters can maintain communication over distances and under conditions which render other operators entirely helpless.

"The spark gap should never be so wide that spark is draggy and irregular, but should always respond instantly to the touch of the Morse key. On the other hand, spark gap should always be kept clear of flame and never become an arc. An arc is of little use for wireless telegraphic signals.

"If the spark arcs, it indicates either that same is too short or that there is insufficient impedance in the primary of the transformer."

Shoemaker, also an inventor, said in his "General Description of the Shoemaker Wireless Telegraph Apparatus" and "Directions for Connecting and Operating," November 15, 1905 (Defendants' Exhibit 83):

"The spark gap should be adjusted so that a clear and uniform sound is given out. If the gap is too wide the spark gives a ragged sound, and if too short it gives a buzzing sound, accompanied by a considerable arc, which should be avoided at all times. When properly adjusted it gives a sharp, clear note, and an intense, bright light, without any signs of an arc.

"After some practice the operator will be able to get this adjustment with great accuracy by the sound alone.

"The spark gap should never be more than one-half inch, as it strains and heats the condensers, and does not increase the working distance to any great extent.

"Another method of adjusting the spark gap is by increasing or decreasing the potential of the secondary of the transformer, or better still by adjusting both the spark gap and the potential of the secondary of the transformer. This may be done by regulating the potential of the primary circuit, by means of the

field rheostat of the A. C. generator. Where the reactance regulator is used in series with the primary of the transformer, the current flow may be increased or decreased to obtain the above results.

"When an arc is present in the spark gap, the current should be decreased in the primary of the transformer, until the arc disappears."

At this time, telephones (resonantly unresponsive) at the receiving end were so thoroughly accepted as the practice of the art that reference in detail to that use is unnecessary. The instructions of De Forest were the result of actual practice, and at this time De Forest was using 133 cycles at certain stations—notably Galilee, Beaumont, Tex., and Boulder, Colo., thus getting more than 250 sparks per second; but the sparks often were not regular, and the spark gaps were generally shortened so as to obtain more than one spark discharge per half cycle.

The Galilee spark was well known along the coast, and was quite successful in getting through static, although, of course, not to be compared with the modern 1,000 spark frequency. The frequency of the Galilee spark was undoubtedly higher than that of the Brant Rock spark of December, 1905. It may have been less musical, or even if it be concluded that it was not musical, it nevertheless had a much more pleasing and certainly a more effective sound, than the sound produced by the low-frequency nonsynchronous gap installations, and it was one of the best stations at the time for getting through static. By common agreement it was the best De Forest practice, although De Forest thought Key West the best. That difference of opinion is not important, for Galilee amply illustrates the state of the art.

De Forest used a plain gap, and it was well known that, when the gap is kept free from arcing by an air blast, the spark will be regular. While Fessenden was experimenting in his way, and De Forest was actually operating commercial stations in his, the Navy was active in practicing still another method. It will suffice to refer to the battleship- Kentucky "whose spark note," according to Gunner Bean, "was especially high and was known so throughout the fleet." The Kentucky used a Slaby-Arco mercury interrupter set. These Slaby-Arco interrupters usually had two segments, and undoubtedly could give regular interruptions and regular sparks—one spark per interruption.

The ambitious Navy operators, anxious to attain good results and in commendable rivalry to outdo each other, often increased the number of segments. Guthrie's entry of August 12, 1905, shows that the Kentucky was using 4 and 6 segment interrupters (and Bean said "it had as high as eight segments"), and that the Kentucky spark was as notable as Bean said is proved by many witnesses from Scanlin, who on June 7, 1905, entered in his Navy log at the Highland station that he "could read Kentucky fine through static," and who described the note as a "very high, shrill note" to Guthrie, who graphically and onomatopœtically said:

"It struck me to be a dandy spark for piercing through static, because there was a sting and a ping in it."

In analyzing the testimony of many witnesses who have attempted

the difficult task of describing in words the characteristics of a sound, nothing is more striking than Guthrie's "sting and ping," for one needs but to say these words, and he will at once realize that they express a high pitch with some musical attribute. Of course, although. the r. p. m. was increased by speeding up, it is impossible to determine the precise frequency in the absence of accurate records; but the fact is established beyond peradventure that the Kentucky note was a then relatively high frequency note, and, like the notes of other Navy ships, sometimes regular and sometimes irregular.

Whatever may have been the observations and conclusions of Lieutenant Hudgins, now deceased, the practical Navy operators knew that this high note "got through" static; and, a little later, Captain Robison set forth his observations of and conclusion from the Navy practice in the Navy Manual of 1906. But the contemporaneous comparison is admirably stated by Cram, a radio engineer of the War Department, and a man of education and wide experience, who had heard the signals during 1905 and 1906; for he thought that the Brant Rock and Kentucky notes were each characteristic, and he said:

"The Kentucky spark was certainly a higher pitch, but not as pure a note as Brant Rock. The Brant Rock station was noted for the smoothness, clearness, and purity of note. The Kentucky spark was certainly higher in pitch and was more certainly identified and read through interference of any kind. * * * The spark from the modern 500 cycle station that is properly adjusted is a purer note than the Kentucky, but not a very different pitch."

Thus, on December 11, 1905: (1) A spark frequency above 120 was high, and the commercial art had gone up to, but not beyond, generators of 133 cycles; (2) De Forest had in practice a spark frequency over 250, but a plain gap usually shortened, so that multiple instead of regular sparks were discharged; (3) the Navy had means for producing regular spark discharges with a frequency which cannot be stated with certainty, but high enough to produce a note, higher in pitch, than Brant Rock, but not as musical; (4) Brant Rock used a synchronous rotary gap, had a musical note, but a frequency not to exceed 250; and (5) in all three systems the telephone was the receiver.

The art stood thus;

| De Forest (Practice) | Navy (Practice) |
|---|---|
| (1) Frequency above 250; | (1) Frequency often but not consistently above 250; |
| (2) a telephone receiver; | (2) a telephone receiver; |
| (3) usually multiple sparks; | (3) means for regular sparks; and sometimes regular, sometimes not. |

Fessenden (Experimental)
(1) Frequency under 250;
(2) a telephone receiver;
(3) regular sparks.

Thus nobody had consistently in practice all the elements of either claim 1 or claim 3, if "definite," as applied to spark frequency, means "regular."

Now, it must not be forgotten that overcoming static was not the only problem with which all these men were contending. They were

seeking greater distance all the time—the most important problem of all. That, of course, was the reason for the Machrihanish station and the Marconi station at Poldhu, and undoubtedly the reason for Fessenden's inquiry of December 22, 1905, supra, as to "what the *strength* of the signals was as received at San Juan."

A musical or any other note might overcome static in a laboratory experiment, but these men were looking for commercial results, and what they wanted to find out was how to produce a sound strong enough to be heard at substantial distances, which at the same time would be of a character to dominate static. Many considerations entered into that problem: The k. w. capacity; the wave length, with the corresponding higher or lower decrement; the detectors; and, in brief, a wealth of important detail, both of principle and apparatus.

Contemporaneous conduct shows that neither the frequency nor the regularity of the Brant Rock spark of December, 1905, impressed Fessenden. Neither the question of spark frequency or regularity ever came up for discussion between Fessenden and his assistants, although, of course, the speed of the engine was kept high, just as De Forest was doing at Galilee and elsewhere.

The rotary gap was old, having been contributed to the art by Tesla in 1896 (United States letters patent No. 568,179), and that regularity of sparks would produce a musical note was well known, as will later appear. But we need not stop with contemporaneous conduct; for sebsequent acts confirm the conclusion that Fessenden had not as yet believed or claimed that regularity was an essential element of his invention. In correspondence with the Westinghouse Company (February 26, 1906), with Howe, of the General Electric Company (March 29, 1906), the Marconi Company (August 27, 1906), the General Electric (April 26, 1907, June 7, 1907, June 11, 1908, June 26, July 2), not a word is said or intimation given as to the desirability of a musical note or regular spark frequency.[3]

This correspondence shows a gradual progression towards higher frequencies and makes certain references to the sensitiveness of the telephone; but meanwhile others were going along the path which De Forest had blazed in a practical way, as is best illustrated by the Navy Manual of 1906. This valuable contribution was prepared by Captain Robison, and was based on previous knowledge gained from the Navy experience, and "was intended to indicate the general opinion existing among radio or wireless men at that time," and, as he says, "they were the results of all my work with the subject."

The book was written in the spring of 1906, having been begun in March and finished in June, and, presumably was distributed in the summer of 1906. (Guthrie's testimony p. 781.) The following full extract is well worth while:

Page 62—"It is evident that, if the spark gap in the circuit under consideration is adjusted to 30,000 volts, but one discharge of the condenser per alternation will take place, and but one train of waves will be sent out. Short-

---

[3] This important correspondence is discussed in detail in defendants' brief. For future use and in the interest of brevity, defendants are authorized to state that I agree fully with defendants' view of that correspondence.

ening the gap will increase the number of discharges per alternation. The exact number for any spark gap length will depend on the time of an alternation—i. e., the frequency, and on the length of time it takes the available power to charge the condenser to the voltage required to break down the gap. Less energy per wave train will be radiated on a short gap than on a long one, because the work done varies as the square of the voltage (see paragraph 86); but the total work done may be equal, on account of the greater number of discharges."

Page 69—"The spark must be kept white and crackling—if too long, it will be stringy; if too short, an arc will be formed. There is no doubt that much of the irregularity noticed in sending is due to irregular action in the spark gap."

Page 81—"It should also be noted that the energy in a wave train depends on the amplitude and number of its oscillations. The effect on the detector being cumulative, there is probably some number of oscillations per train, which is most efficient. Therefore, in considering the action of electric wave detectors, we should look upon it as being produced by electric wave trains of a certain number of oscillations or waves per train, and a certain number of trains per second, or per dot, and the most efficient use of any given power will be made when the energy is best distributed, both in any train and in the number of trains per second."

Page 82—"By distributing the available energy over a greater number of wave trains per second, a weaker sound, but a higher note, is produced. *The human ear is not equally affected by sounds of equal loudness, regardless of their pitch.* The note of a 60-cycle alternator is an octave above that of a mercury turbine interrupter, making 1,800 revolutions per minute, and having a two-segment ring—that is, two breaks per revolution and sparking only on the break. *The higher frequency produces a more piercing spark, one that can be distinguished farther than the one of lower frequency, though probably of greater intensity. In order to get the very best results, the frequency used should be that to which the operator's ear and the telephone diaphragm are most sensitive. Telephone diaphragms which will respond best to sounds of a particular frequency can be made.* Resonance is thus seen to be a highly important quality in wireless telegraph circuits: * * * (5) *Resonance of human ear with telephone diaphragm.* All these are changeable at will, except the last, which cannot be changed, and is different for different people. Experimental data on this subject are exceedingly limited, but such as we have indicate that the average human ear is most sensitive to notes of higher frequencies than those thus far generally used in wireless telegraphy."

Page 109—"The discharges are usually intermittent and vary in strength; sometimes they are almost continuous, and are described as a continuous roar, through which it is impossible to read signals. In this respect *the note of the spark* (the frequency of the wave trains) affects reception, a *high, clear note being easier to read than any other.* Less sensitive detectors can sometimes be successfully used when static disturbances render the more sensitive ones useless. Whatever tends to selectivity or inertia in receiving circuits, such as large inductances, also tends to decrease static interference. It is found that closed receiving circuits not directly connected to the open circuit are less affected by static. The static charges, having a direct path to ground, do not accumulate on the aerial, and the aerial, being only inductively connected to the closed circuit, impulses out of tune are much weakened in the transfer. When the signals it is desired to read are strong, static can be largely eliminated by disconnecting the ground without destroying the signal."

Page 110—"As previously stated, 60 cycles, normal frequency, are used *because this is a commercial type of motor generator. It appears probable that a higher frequency will give better results.*" (While I have italicized only part, every word is worth reading.)

From the foregoing outline of the state of the art, I have omitted many references to scientific books and discussions, because the De Forest, Shoemaker, and Navy books used language so simple and clear that they summarized the art in a manner which could be under-

stood by the operator of modest attainments, who might be lost in the more technical and intricate discussions addressed to men of science.

But at this point it becomes necessary to appreciate something of the literature and apparatus directed to the subject of regular sparks and musical notes. That regular sparks would produce musical notes was common knowledge and belief (the reason why I say belief to appear infra) long before July 1, 1907, or December 11, 1905. Thus, in Maxwell's Theory and Wireless Telegraphy by Poincare and Vreeland 1904 (page 190), in describing the action when an electrolytic detector is used with an ordinary telephone, the author says:

"The slightest irregularity in the sending spark has its effect in altering the note in the telephone—indeed, a variation in the temperature or quality of the sending spark is often observed by the receiver when the sending operator himself cannot detect it—and even when a Wehnelt interrupter is used at the transmitting end, producing sparks at the rate of a thousand or more per second, each impulse is separately detected by the receiver, and the resulting *musical note* is clear and strong."

Eichhorn (Leipzig, 1904), Murgas, the Electrical Review of October 25, 1902, and of December 2, 1905, Pupin (United States letters patent No. 768,301 of August 23, 1904), Captain Robison's report (Defendants' Exhibit 208), late in 1905, and Captain Robison's testimony as to the test of the Murgas system at Wilkesbarre on November 23, 1905—not to speak of Blondel—all go to the same information; and if any more is desired on this subject, it will be found in extenso in Stone's exposition (particularly at pages 2622–2698).

The Tesla rotary spark gap, already referred to, was as old as 1894 or 1895 (Tesla letters patent Nos. 541,168, 568,179, 609,245, and 725,605); while Fessenden's patent No. 730,753, of June 9, 1903, showed means for getting exact regularity of spark frequency, and Elihu Thomson, in his No. 645,675, Shoemaker, in his No. 749,584, of January 12, 1904, and Blondel, in his No. 783,923, of February 28, 1905, also disclosed means adapted to produce regularity of spark frequency.

That the ear was not only more sensitive to high pitch than to sounds of a low pitch, but that it was also more discriminating as to pitch, had long been recognized by such men as Helmholtz, Preyer, and Lord Rayleigh (see Zahm's "Sound and Music," 1909); but again we need go no further than De Forest and Robison. All the elaborate experiments and treatises teach no more on the practical side of the art than did these men to their operators, and, while Fessenden was still trying to satisfy himself and·supposing that he had made a great physiological discovery, everyday operators knew or were told the fact that they could hear a high frequency spark better than a low one, and that it was more effective for getting through static.

This, then, was the state of the art when Fessenden went to the Patent Office. High frequency was old, regular sparking was old, and the telephone receiver in radio was old. True, the Navy had abandoned the Slaby-Arco mercury turbine interrupter for the 60-cycle generator, furnished, however, by Fessenden's company during

the latter part of 1906 and early in 1907, because, as Robison said, "this is a commercial type of generator."

The Slaby-Arco had not been abandoned because the Navy desired to go back to low frequency, but, obviously, because of difficulty in keeping the apparatus clean and in good order. De Forest could go no further, because he and his company were in straitened financial condition. He says so, and there is no reason to doubt his statement; for, as Fessenden put it in his letter to Edwards of the General Electric, as late as June 11, 1908:

"I note that the prices are very high, and if it were not for the fact that the 500-cycle machine does the work of a low frequency machine of much greater output, we would not consider using them," et seq.

Whether in Fessenden's correspondence with the General Electric Company in February, March, and April, 1906, in regard to a 240-cycle generator, he had in mind 240 or 480 sparks, makes no difference, for, in view of the state of the art and, to be repetitious, the explicit teaching of De Forest, 480 sparks would not be invention over 266 sparks, especially as the principles affecting high frequency had been clearly stated; and so also as to the letter of February 28, 1906, to the Westinghouse Company and the conversation with Mr. Young of that company, said to have taken place in February, 1906.

The truth is that the evidence of things done, the correspondence throughout culminating in the letters of May 8, 1907, and June 7, 1907, to the General Electric Company, and the fair inferences from Fessenden's specification, indicate beyond peradventure that what he thought was his invention was made about April or May, 1907; and, in any event, plaintiffs have failed to carry the burden resting upon them when they seek to establish an earlier date of invention.

As I look back upon what I have written, it might be pertinent to ask why a consideration of the patent and the file wrapper have been so long delayed. The answer is that this history must be lived in chronologically; for in no other way can a true appreciation be had of the state of the art, paper and commercial, on July 1, 1907. On that date there were just two possibilities: (1) To annul, exclude, eliminate static; or (2) to improve the wireless note by method or apparatus, or both, so far beyond the art as to constitute invention. The first has not been done. He who shall accomplish that need have no fear of the fate of his invention.

Fessenden undertook the second. As filed, the word "definite" does not appear either in the specification or claims. The specification, from line 62, page 2, to the end of the claims, was omitted, and in place of it there was the following paragraph:

"Any suitable means of obtaining the desired spark frequency may be used. *The receiver is preferably mechanically tuned,* as well as electrically; but this is not shown or claimed herein, as it is shown and claimed in other applications."

And the following claim:

"1. In a system of wireless signaling, the production of signals by groups of impulses having a group frequency higher than commercially used alternating current frequencies and within the limits of audition."

By an amendment of November 16, 1908, the patentee inserted the matter on page 1, line 51:

"The rate of vibration being altered at will by shifting the weight *19a* on the reed."

The claims were changed, four new claims being presented, of which the first included:

"Using a group frequency for the impulses higher than 125 per second, but within the limits of audibility."

The second was the same as the fourth claim of the patent, the third had similar language to the first in the above respect, and the fourth included:

"A group frequency above the ordinary disturbing commercial frequencies, but within the limits of sensibility of an aural receiver."

The case had been rejected on reference to Blondel's patent, No. 824,682, of June 26, 1906, and Fessenden, in support of the above-mentioned claims, argued that:

"The methods given by Blondel * * * are impracticable and inoperative for giving group frequencies. The inductance of a Reuhmkorff coil is too great to be used with a circuit breaker of the kind described, and an electric circuit breaker does not give any *definite and constant frequency*. Nor can any *definite number of discharges* be obtained from an alternating current dynamo in the manner stated, for even if a number of discharges may be obtained for every half wave, they are irregular in the interval between discharges being closer together at the top of the wave than at the beginning or end of the wave. It is therefore plain that Blondel never used any such frequency as that to which he refers, and since the methods described are incapable of producing them, this reference is no anticipation. * * *"

In an affidavit dated November 23, 1908, Fessenden stated that he had discovered:

"That the sensitiveness of the ear increased to a very great extent for frequencies above those heretofore used in wireless signaling, and reached a maximum at about 920 impulses per second, and thereafter began to decrease"

—and then described the results from using a spark frequency of 960 per second, as contrasted with 120 per second. He also believed that Lord Rayleigh was wrong in concluding (as he construed) that the ear was equally sensitive to all frequencies—an error which he pointed out was later corrected by that distinguished scientist, when he independently discovered what Fessenden asserted he himself already knew.

On January 12, 1909, the office examiner rejected three out of the four claims, and on March 13, 1909, a further amendment and argument was filed. Up to March 13, 1909, the situation of the file wrapper was:

(1) The word "definite" did not appear once, either in specification or claims.

(2) The word "musical" did not appear anywhere.

(3) Fessenden had used the isolated parenthetical expression (page 2, line 34) referring to a frequency of 250 as "being generated by dynamo of *approximately* 125 cycles per second"—an expression

which, read with the context, does not convey the meaning of absolute definiteness insisted upon.

(4) Fessenden said:

"I discovered * * * that when higher frequencies were being used for signaling the attention of the hearer was concentrated on the higher notes to such an extent that the lower noises made by atmospheric disturbances ceased to affect the consciousness."

It is now contended that "note" is used in its strict technical sense, meaning a musical note produced by "definite" frequency; but it is plain that "note" was the language of the art, paper and practical, for a wireless signal, and "noise" was the common description of the sounds of static. Besides, it will not do to drag out one sentence from a specification, and give to cloudy inference the dignity of that clearness which the statute requires, when nowhere else, in drawing, specification, or claim, can the meaning urged be found.

(5) Fessenden preferred mechanical tuning.

(6) Fessenden, referring to the spark gap, simply said "37 is a spark gap," and 37 in Fig. 3 of the drawings showed an ordinary plain gap—concededly not an instrumentality for automatic regularity, but a gap which must be kept clear of arcing by air blast, or otherwise regulated, in order to assure regular sparks.

(7) Fessenden showed a close regulation of the dynamo speed, the contention here being that this was of value in enabling proper spark gap and condenser adjustments to be made; but the simple and known means for insuring regularity, such as the rotary gap, was not shown nor described.

(8) Fessenden was wrong in characterizing Blondel's methods as inoperative.

(9) Fessenden was wrong about Lord Rayleigh. Vide Lord Rayleigh's articles in the Philosophical Magazine for 1894 and his "Theory of Sound," 2 volumes.

The result is that prior to March 13, 1909, "definite," in the sense of regular, had not been disclosed.

Responding to the examiner's letter of January 12, 1909, citing Stone, No. 767,892, Shoemaker, No. 749,584, and Ehret, No. 785,803, Fessenden, obviously still worrying about Blondel, amended by adding from the word "heretofore," on page 2, line 62, to the word "note," on page 2, line 119, and then abandoned the preference for mechanical tuning, and substituted and added down to the word "used," on page 3, line 6. Thus, what theretofore read:

"Any suitable means of obtaining the desired spark frequency may be used. The receiver is preferably mechanically tuned, as well as electrically, as shown in my United States patent No. 727,526"

—now became:

"Any suitable means of obtaining the desired spark frequency may be used, as, for example, an alternating current dynamo having a frequency of 500 cycles, as above referred to. While the receiver may also be mechanically tuned to the group frequency, this is not always advantageous, and moreover it is not part of the present invention, having been already shown and claimed in my prior patent, No. 727,325, of May 5, 1903. In describing the indicator as 'resonantly unresponsive' to the group frequency, such phrase is intended to

mean an indicator which, on being affected by aperiodic impulses, does not emit a note of the group frequency being used."

In the foregoing the word "definite" appears just once (page 3, line 118), and then in the sense of predetermined or selected. But now, as if dropping unheralded from the sky, the word "definite" appears in claims 1, 2, and 3 for the first time. Now, at this time, "definite" might have meant "predetermined," as defendants contend, or "regular," as plaintiffs contend.

There is a good deal in the prior art and in the history of Fessenden's prior patents and experiments to support defendants' contention; but I prefer to take the broader view, and assume that now Fessenden meant "definite" in the sense of regular, and that those skilled in the art, when confronted by the ambiguity, would have concluded that "regularity" was meant, especially in view of the fact that the use of a resonantly unresponsive receiver and the abandonment of preference for a tuned receiver would negative the idea that Fessenden meant predetermined.

But now the patent is impaled on the horns of a real dilemma: Either "definite" in combination was new matter not supported by oath, or by virtue of the prior art and the file wrapper history it was old, or obvious, or both, and the only theory upon which the changes of March 13, 1909, can be supported is that they were additions of well-known matter to complete an imperfect showing. The importance of watching closely vital changes in the progress of an application through the Patent Office is strikingly illustrated here, because, when Fessenden added "definite," in March, 1909, Cabot's application for his patent No. 937,281, dated October 19, 1909, had been filed as far back as December 31, 1906, and the Telefunken Company, as appears from the paper read by Count Arco at the seventeenth annual convention of the Federation of German Electrical Engineers, claimed to have introduced the high frequency spark on new installations in this country and elsewhere, since the spring of 1907—the point, among other things, being that the high frequency generator of Fessenden was probably not novel in 1909, even in practice.

But I will go further. In view of the then known and now understood prior art, the Blondel patent, No. 824,682, now looms up larger than ever; for Blondel had high and definite frequency, and everybody knew that high frequency was effective with ordinary as well as tuned receivers. Fessenden, in his argument supporting the amendment of March 13, 1909, speaks of a "musical note" as a matter of course, when he refers to the musical notes of static and of a transmitting station; and Blondel, whose application was filed as early as December 3, 1900, had expressed his views in a sealed communication in 1898 to the Academy of Sciences at Paris, which he quoted as early as 1900 in "Comptes Rendus des Séances de l'Acadamie des Sciences."

If, therefore, we return to July 1, 1907, we have, in addition to everything else, Blondel's frequencies as high as 900 and definite; and throughout it must not be forgotten that to sustain the patent it must be assumed that the skilled man, who read Fessenden's *original*

application and drawings, would have substituted a rotary gap for the plain gap there shown, and from that assumption it follows logically that that feature must have been obvious. From what has been outlined, and much more which could be added if space permitted, I am fully satisfied that, even assuming July 1, 1907, as Fessenden's date, his patent does not show invention. So holding, a discussion of questions of anticipation becomes unnecessary.

To resolve a doubt, if such existed, plaintiffs point to commercial utility. Of course, the 1,000 spark frequency produces an excellent note and is extensively used; but it is not exclusively used. More than that, I think there is no escape from the conclusion that the commercial art had been moving up rapidly because of disasters at sea and greater requirements set by governments and international conventions. Wireless was being transformed from a dream to a reality, with capital to back it, and hence expense was not the deterrent which it had been in the earlier days.

But, finally, I am not by any means convinced that "definite" spark frequency is sine qua non above certain lower limits of frequency. Of course, the fact must be acknowledged that the method and apparatus show how to produce a musical note of high pitch, which is of great service in dominating static; but, as aptly put in the Telefunken Zeitung, supra:

"Corresponding to the manifold demands of the practice, many methods may exist side by side."

The experiments of Waterman and Weagant raised a serious doubt as to the necessity for absolute definiteness in connection with high frequency; but the tests at Sayville, at which I was present, have in my opinion demonstrated that a note musical in quality, of high pitch, and effective may be produced without that regularity required by the patent.

Some suspicion was suggested as to the surreptitious nature of certain adjustments; but, fortunately, the arrangements made by me were such as to negative this suggestion. No one for a moment would think that the counsel for defendants would be parties to any deception, and I cannot permit myself to believe that the engineers and employés at the Sayville station, who were present at these tests, would willfully deceive the court by trick and device.

To the eye it seemed that the sparks were not regular, and this visual impression was confirmed by the photographs contemporaneously taken and later received in evidence. Kintner made a brave and ingenious effort to show that the sparks were in fact regular; but there were so many exceptions to regularity, even if Kintner's theory were adopted, that it is plain that in the method in use at Sayville exact regularity is not sought nor attained. The sparks at Sayville were of the order of 640 and irregularly spaced. The resultant note of musical quality is accounted for by an interesting, and to the layman unusual, law explained in

"The Elements of Physics, A College Text-Book, by Edward L. Nichols and William S. Franklin, in three volumes, vol. III, Light and Sound, New Edition, Revised and Rewritten. New York, The Macmillan Company: London, Macmillan Company. 1909."

For convenience, and because of its importance, section 202 of Nichols and Franklin is quoted in full:

"202. *Consonance and Dissonance.*—An intermittent or fluctuating tone produces an unpleasant sensation which is called discord or dissonance. A steady tone, or one which fluctuates so rapidly as to give a steady sensation, produces a pleasing effect which is called concord or consonance. These terms discord or dissonance and concord or consonance are used to express the effects produced by two or more simultaneous tones, that is, they are used to express the relations of tones. Nevertheless, the above definitions are physically correct, as will appear in the following discussion.

"Consider a tone which is intermittently shut off from the ear, the intermittence beginning at low frequency and increasing to greater and greater frequency. The dissonance at first increases with increasing frequency of intermittence, reaches a maximum, then falls off, and disappears entirely when the frequency of intermittence becomes so great that the sensation of the tone becomes smooth and continuous. The frequency of intermittence for which the dissonance is a maximum, and the frequency of intermittence for which the sensation becomes smooth and continuous depend upon the vibration frequency of the tone which is used, as is shown in the table on page 210.

| "Vibration.<br>Frequency<br>Of Intermittent<br>Tone. | Frequency of Intermittence.<br>When Tone<br>Becomes<br>Smooth. | When Discord<br>is a maximum. |
|---|---|---|
| 64 | 16 | 6.4 |
| 128 | 26 | 10.4 |
| 256 | 47 | 18.8 |
| 384 | 60 | 24.0 |
| 512 | 78 | 31.2 |
| 640 | 90 | 36.0 |
| 768 | 109 | 43.6 |
| 1,024 | 135 | 54.0 |

"The fluctuations of tone which produce dissonance in music are due to beats. When two tones are in unison they give a smooth sensation. If the vibration frequency of one tone is slowly increased beats occur with greater and greater frequency, the intermittent sound sensation becomes more disagreeable or discordant, and soon reaches a point of maximum discord, after which the discord decreases again. When the beats become sufficiently frequent, the sensation becomes smooth because of the persistence of the sound sensations."

To the foregoing should be added the answer of Stone to Q. 92: "Would the tone produced by the telephone be smooth or harsh?" as follows:

"It would depend upon the frequency of recurrence of the impulses, as determined in the tables given in the book on physics by Professors Nichols and Franklin, to which I have referred to-day. If the natural periodicity of the diaphragm of the telephone be 1,024 vibrations per second, then the frequency of the impulses necessary to produce a smooth or consonant tone in the telephone would be 135 per second, while, if the frequency of recurrence of the impulses acting on the telephone diaphragm be 54 per second, the notes produced would be extremely harsh. Again, if the natural frequency of vibration of the diaphragm be 768 per second, the frequency of recurrence of the impulses required to produce a smooth tone would be 109 per second, while a frequency of recurrence of impulses of 43.6 per second would produce an extremely harsh tone in the telephone."

Thus what was seen and heard at Sayville is amply confirmed in theory. Irrespective of the conclusion as to the validity of the patent,

it is apparent (and indeed conceded) that the defendants do not at Sayville infringe claim 3; and because, among other reasons, the spark frequency is not definite, they do not infringe claim 1. There is really no proof of infringement at West Street; but, in any event, neither claim is infringed for the reasons, supra. Of course, it is urged that in any event, both Sayville and West Street did at one time infringe; but, in view of my opinion as to the patent, that question becomes academic.

Finally, although Stone at the moment stands alone, I think that scientists in course of time (if they have not done so already) may find that he is right in his theory as to the relation between persistent wave trains and musical radio notes; but we need not speculate, when it is clear that regularity, in the sense of the patent, is not needed in high frequencies.

In this opinion, of necessity, I have omitted many references to testimony, patents, and scientific writings which confirm the conclusion, for the reasons, here outlined, that the method patent is invalid, and, in any event, is not infringed.

In the apparatus patent, the sentence, "The receiver is preferably mechanically tuned as well as electrically," was permitted to remain; and this is an additional defect which, in view of the prior art, and the controversy as to the word "definite," is destructive of validity.

As, in my opinion, the suit in the Third circuit does not operate as an estoppel, the complaint must be dismissed, and a decree may pass accordingly.

